**United States District Court**
For the Northern District of California

**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C. PRESTON BUTCHER, et al.,

        Plaintiffs,               No. C 03-3553 PJH

    v.                        **ORDER RE DEFENDANTS' MOTION**

GULF INSURANCE COMPANY, et al.,    **FOR SUMMARY JUDGMENT**

        Defendants.

_____/

      Defendants' motion for summary judgment came on for hearing on May 18, 2005, before this court. Plaintiffs appeared by their counsel Philip Borowsky, and defendants appeared by their counsel Andrew L. Margulis. Having read the parties' papers and carefully considered their arguments, and good cause appearing, the court hereby GRANTS the motion for summary judgment on plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing, GRANTS the motion with regard to the counterclaims for breach of warranty, concealment, and material misrepresentation, and DENIES it with regard to the counterclaim for fraud.

**INTRODUCTION**

      This is an action alleging breach of contract and seeking damages and declaratory relief in connection with an insurance company's refusal to pay defense costs. Plaintiff C. Preston Butcher ("Butcher") is an individual who resides in California. Plaintiff Legacy Partners, Inc. ("Legacy Partners"), is a California corporation, whose sole shareholder, director, and president is Butcher. Plaintiff Legacy Partners 2323 LLP ("Legacy 2323") is a California limited partnership. Butcher has established a revocable living trust, which is one of

United States District Court
For the Northern District of California

1   the general partners of Legacy 2323.  Legacy 2323 has five other general partners (Jeffrey K.

2   Byrd ("Byrd"), Gary J. Rossi ("Rossi"), Guy K. Hays ("Hays"), Stuart L. Leeder ("Leeder"), and

3   W. Dean Henry ("Henry")) and three limited partners.

4        Plaintiff Legacy Partners 387 LLP ("Legacy 387") is a California limited partnership.

5   As with Legacy 2323, Butcher's revocable living trust is a general partner.  Legacy 387 has

6   two other general partners (Leeder and Mack Pogue, Inc., as assignee of Mack Pogue), and

7   eight limited partners (some of whom are general partners of Legacy 2323).

8        Plaintiff Archer Limited Partnership ("Archer") is a California limited partnership.

9   Plaintiff Legacy Partners 2297 L.P. ("Legacy 2297") is a California limited partnership, and is

10  the general partner of Archer.

11       Plaintiff Legacy Partners Management L.P. ("Legacy Management") is a California

12  limited partnership.  Plaintiff Legacy Partners Residential, Inc. ("Legacy Residential") is a

13  Delaware corporation that serves as a managing general partner of Legacy Management.

14       Defendants refer to all the plaintiffs in this action collectively as "Legacy."  Legacy

15  Partners, Legacy 2323, Legacy 387, Archer, Legacy 2297, Legacy Management, and Legacy

16  Residential are referred to as the "Legacy Partners entities."

17       Defendants Gulf Insurance Company and Gulf Underwriters Insurance Company

18  (collectively "Gulf") are both Connecticut corporations.

**THE INSURANCE POLICY**

20       In 2000, Gulf issued a General Partners Liability and Partnership Indemnification policy

21  to the plaintiffs.  The initial policy period was February 1, 2000, to February 1, 2001, and the

22  policy was renewed for a second policy period, from February 1, 2001, to February 1, 2002.

23       The policy provides for three types of coverage.  First, Gulf is obligated to pay the

24  insureds[1] up to $10 million for any "Loss" incurred by any General Partner as a result of any

---

26  [1]  The original complaint states that the "insureds" are Legacy Partners, Legacy 2323,
27  Legacy 387, Butcher, and the general and limited partners of Legacy 2323 (Byrd, Rossi, Hays, Leeder, Henry, and Denny McLarry ("McLarry")), plus two non-defendant California limited liability companies (Legacy Partners 2320 LLC and Legacy Partners 2330 LLC) and a non-defendant
28  California limited partnership (Legacy Partners 2295 L.P.).  The definition of "named insured" under the policy, however, is much broader.

United States District Court

For the Northern District of California

"Claim" for a "Wrongful Act" made against any General Partner during the policy period. Second, Gulf is also required to pay up to $10 million which any Insured Partnership or any Organizational General Partner was required to pay as indemnification to any General Partner as a result of any "Claim" for a "Wrongful Act" made against any General Partner during the policy period.  Third, Gulf is required to pay defense costs of any General Partner, Organizational General Partner, or Insured Partnership, incurred in defending or investigating any "Claim."  The policy specifies that it does not provide for "any duty by the insurer to defend any general partner."

Section II(C) of the policy defines "Claim" as

(1)    a written demand for monetary or non-monetary relief,

(2)    a civil proceeding commenced by the service of a complaint or similar pleading,

(3)    a criminal proceeding commenced by the return of an indictment, or

(4)    a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document.

Section II(J) of the policy defines "Loss" as

the total amount which any General Partner becomes legally obligated to pay as the result of all covered Claims first made against any General Partner during the Policy Period for Wrongful Acts including, but not limited to, damages, judgments, settlements and Defense Costs.

Among other things, "Loss" does not include salaries of General Partners, punitive damages, criminal or civil fines or penalties, taxes, any amount not indemnified by the Insured General Partnership or Organizational General Partner for which the General Partner is absolved from payment, any amount allocated to uncovered Loss, or matters uninsurable under the law.

The policy also includes a number of exclusions, some of which are referenced below in connection with the discussion of defendants' motion for summary judgment on the breach of contract claims.

Gulf sent Legacy a binder of insurance for the General Partners Liability policy on February 1, 2000.  The binder provided that the issuance of the policy was subject to, among other things, the receipt, review, and acceptance by Gulf of a completed application.  The

United States District Court

For the Northern District of California

liability limit was $10 million, and one-year premium was $193,000.

The policy application was also dated February 1, 2000.  Paragraph 10 of the application stated,

> There has not been, nor is there now pending, any claim against anyone proposed for insurance in the capacity as either a General Partner of an Insured Partnership or director or officer of any Subsidiaries, except as follows.

The insureds responded, "None, other than general liability & workers' compensation and other claims in the ordinary course of business."

Paragraph 11 of the application stated,

> No General Partner of an Insured Partnership or director or officer of any Subsidiaries has knowledge or information of any fact, circumstance, or situation which might give rise to a Claim under the proposed Policy, except as follows.

The insureds responded that they had no such knowledge or information.

Paragraph 15 of the application stated,

> It is agreed with respect to Questions 9, 10, 11, and 12 above that if such knowledge or information exists (whether or not disclosed) in addition to any other remedy the Insurer may have, any Claim arising therefrom will be excluded from this proposed coverage; however, this exclusion shall apply only with respect to the Insured having such knowledge or information, if the Policy so provides.

At the end of the application, appeared, in all caps (emphasis added):

> IT IS AGREED BY THE APPLICANT AND THE GENERAL PARTNERS THAT THE PARTICULARS AND **STATEMENTS MADE IN THIS APPLICATION**, TOGETHER WITH ALL ATTACHMENTS TO THIS APPLICATION AND ANY OTHER MATERIALS SUBMITTED TO THE INSURER (ALL OF WHICH ATTACHMENTS AND MATERIALS SHALL BE DEEMED ATTACHED TO THE POLICY AS IF PHYSICALLY ATTACHED THERETO) **SHALL BE THE REPRESENTATIONS AND WARRANTIES OF THE INSURED PARTNERSHIP AND THE GENERAL PARTNERS.** IT IS FURTHER AGREED BY THE INSURED PARTNERSHIP AND THE GENERAL PARTNERS THAT **THIS POLICY**, IF ISSUED, **IS ISSUED IN RELIANCE UPON THE TRUTH OF SUCH REPRESENTATIONS AND WARRANTIES** WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS POLICY.

> THE **UNDERSIGNED** AUTHORIZED EXECUTIVE OF THE APPLICANT **WARRANTS THAT THE STATEMENTS SET FORTH IN THIS APPLICATION** AND ITS ATTACHMENTS AND OTHER MATERIALS SUBMITTED TO THE INSURER **ARE TRUE AND CORRECT**.

> SIGNING OF THIS APPLICATION DOES NOT BIND THE APPLICANT OR THE INSURER.  **IN THE EVENT THERE IS ANY MATERIAL CHANGE IN**

4

1  **THE ANSWERS TO THE QUESTIONS HEREIN PRIOR TO THE**
   **ISSUANCE DATE OF THE POLICY**, WHICH WOULD RENDER THIS
2  APPLICATION FORM INACCURATE OR INCOMPLETE, **THE APPLICANT**
   **WILL NOTIFY THE INSURER IN WRITING** AND, IF NECESSARY, ANY
3  OUTSTANDING QUOTATION MAY BE MODIFIED OR WITHDRAWN.

4       On March 29, 2000, Legacy submitted the completed application to Gulf.  The

5  application was signed on behalf of all prospective insureds by Rossi, a general partner of

6  one of the Legacy entities, and an Executive VP and CFO of Legacy Partners, Inc.

7       On April 27, 2000, after reviewing the application, Gulf issued the policy to Legacy.

8                              **THE PRESENT ACTION**

9       On March 19, 2003, four plaintiffs – Butcher, Legacy Partners, Legacy 2323, and

10  Legacy 387 – filed the complaint in the present action in the Superior Court of California,

11  County of San Mateo, alleging causes of action for breach of contract, professional

12  negligence, and insurance bad faith, in connection with a refusal by Gulf Insurance Company

13  to pay on claims submitted by plaintiffs.  These claims were for defense costs incurred in

14  Woodson v. Legacy Partners 2323 L.P. (Superior Court of California, County of San Mateo,

15  Case No. 415509) ("the Woodson claim"); for defense costs incurred in connection with the

16  cross-claim filed in Woodson v. Legacy Partners 2323 L.P. ("the Woodson cross-claim"); and

17  for defense costs incurred in connection with the cross-claim filed in Butcher v. Pogue

18  (Superior Court of California, County of San Francisco, Case No. 320146) ("the Pogue

19  claim").

20       The original complaint in this action named Gulf Insurance Company, but not Gulf

21  Underwriters Insurance Company, as a defendant.  The original complaint also named Willis

22  Insurance Services of California, Inc. ("Willis"), plaintiffs' insurance broker, as a defendant.  On

23  July 22, 2003, plaintiffs dismissed Willis from the case.  At that point there was complete

24  diversity, and defendant removed the case.

25       On February 6, 2004, plaintiffs filed an "Amendment to Complaint," in which they added

26  allegations relating to Gulf Underwriters Insurance Company, and purported to add that

27  defendant to the case.  On March 11, 2004, pursuant to stipulation, plaintiffs filed a first

28  amended complaint, naming both Gulf entities as defendants.  The amended complaint

United States District Court

For the Northern District of California

1  alleges four causes of action: 1) breach of contract, in connection with defendants' refusal to

2  pay on the "Woodson" claim and the "Woodson" cross-claim; 2) breach of contract, in

3  connection with defendants' refusal to pay on the "Pogue" cross-claim; 3) a claim for

4  declaratory judgment, seeking a declaration as to Gulf's obligation to pay the loss and the

5  defense costs incurred as a result of the "Woodson" and "Pogue" matters; and 4) breach of

6  the implied covenant of good faith and fair dealing, in connection with Gulf's handling of the

7  claims in connection with the "Woodson" and "Pogue" matters.

8          On October 15, 2004, pursuant to stipulation, Gulf filed an amended answer to the first

9  amended complaint, and four counterclaims.  The counterclaims seek rescission of the

10  insurance policy 1) for breach of warranty, 2) for violation of material warranty, 3) for

11  concealment, and 4) for fraud.

12          On October 26, 2004, pursuant to stipulation and order, plaintiffs filed a "Supplemental

13  Complaint," which purports to incorporate all the allegations of the first amended complaint,

14  and which adds four new plaintiffs and two additional causes of action involving those

15  plaintiffs.[2]  The new plaintiffs are Archer, Legacy 2297, Legacy Management, and Legacy

16  Residential.[3]  Plaintiffs allege that Gulf wrongfully refused to pay plaintiffs' claim for defense

17  costs incurred in Archer Limited Partnership v. Essex Portfolio, L.P. (Superior Court of

18  California, County of San Francisco, Case No. 321195) (the "Essex" claim).  The two new

19  causes of action are a fifth cause of action for breach of contract, in connection with the

20  "Essex" claim; and a sixth cause of action for breach of the implied covenant of good faith and

21  fair dealing, in connection with Gulf's handling of the "Essex" matter.

22          Gulf now seeks summary judgment on its counterclaims and on plaintiffs' causes of

23  action.

24

25  _____

26      [2]  Neither the October 26, 2004 "Supplemental Complaint" nor the February 6, 2004
    "Amendment to Complaint" were filed in conformance with Civil Local Rule 10-1.

27      [3]  According to the Supplemental Complaint, the "insureds" also include these new
28  plaintiffs – Archer, Legacy 2297, Legacy Management, and Legacy Residential – in addition to
    the "insureds" indicated in note 1, above.

6

**United States District Court**
For the Northern District of California

1    **DISCUSSION**

2    A.    Legal Standard

3        Summary judgment is appropriate when there is no genuine issue as to material facts

4    and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Material

5    facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477

6    U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient

7    evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

8        A party seeking summary judgment bears the initial burden of informing the court of the

9    basis for its motion, and of identifying those portions of the pleadings and discovery

10   responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v.

11   Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at

12   trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for

13   the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial,

14   the moving party can prevail merely by pointing out to the district court that there is an absence

15   of evidence to support the nonmoving party's case.  Id.  If the moving party meets its initial

16   burden, the opposing party must then set forth specific facts showing that there is some

17   genuine issue for trial in order to defeat the motion.  See    Fed. R. Civ. P. 56(e); Anderson,

18   477 U.S. at 250.

19       "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some

20   significant probative evidence tending to support the complaint."  Smolen v. Deloitte, Haskins

21   & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).  The court must view the

22   evidence in the light most favorable to the non-moving party.  United States v. City of Tacoma,

23   332 F.3d 574, 578 (9th Cir. 2003).  The court must not weigh the evidence or determine the

24   truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v.

25   Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).  If the nonmoving party fails to show that

26   there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."

27   Celotex, 477 U.S. at 323.  Regardless of whether plaintiff or defendant is the moving party,

28   each party must "establish the existence of the elements essential to [its] case, and on which

1    [it] will bear the burden of proof at trial." Id. at 322.

2    B.     Defendants' Motion

3           Gulf seeks summary judgment on its counterclaims and on plaintiffs' causes of action

4    for breach of contract and breach of the implied covenant of good faith and fair dealing.  Gulf

5    asserts that it is entitled to rescission of the insurance policy because plaintiffs made false

6    statements in the policy application.  Specifically, Gulf contends that while plaintiffs warranted

7    that there were no "Claims" pending (as defined in the policy) and that no officer, director, or

8    general partner had any information concerning any matter that might result in a "Claim,"

9    plaintiffs did in fact have information regarding the potential "Woodson" claim at the time the

10   policy application was pending.

11          Gulf contends that summary judgment should be granted on plaintiffs' breach of

12   contract claims because no coverage exists under the policy for the "Woodson," "Pogue," or

13   "Essex" claims or the "Woodson" cross-claim.  In addition, Gulf argues that summary judgment

14   should be granted on plaintiffs' bad faith insurance claim because plaintiffs cannot establish

15   that Gulf unreasonably withheld policy benefits.

16          1.     The claims for which plaintiffs seek coverage

17                               "Woodson" matters

18          There are two "Woodson" matters – the "Woodson claim" and the "Woodson cross-

19   claim."  Until 1991, Jim Woodson ("Woodson") was a general partner in Legacy 387.  Since

20   that time he has been a limited partner in Legacy 387.  In March 1999, Woodson notified

21   Legacy Partners of certain financial disputes that he had with Legacy Partners, in connection

22   with an alleged lost partnership opportunity.  During the period between March 1999 and late

23   2000, Woodson and Legacy Partners engaged in discussions in an attempt to resolve their

24   dispute.  In March 2000, Woodson made a written demand on Legacy Partners for settlement

25   of his "claims."

26          In January 2001, Woodson filed suit against Butcher, Legacy 2323, Legacy 387, and

27   the general partners of various Legacy-related entities (including general partners Byrd,

28   Rossi, Hays, Leeder, Henry, and McLarry, as well as general partners Mack Pogue, Mack

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

Pogue, Inc., the Pogue Children's Trust, and B. Jack Pogue as trustee for the Pogue

Children's Trust), for breach of contract, breach of fiduciary duty, fraud, and numerous other

torts.  That suit, Woodson v. Legacy Partners 2323 L.P., was filed in the San Mateo  County

Superior Court.  Legacy 2323 and Legacy 387 were served with a copy of the complaint on

February 7, 2001, and forwarded it to Gulf Insurance on February 15, 2001.

Two of the defendants in the Woodson action, Mack Pogue and B. Jack Pogue, trustee

for the Pogue Children's Trust, filed a cross-complaint for equitable indemnity in April 2001,

against Butcher, Byrd, Rossi, Hays, Leeder, and Henry (the Legacy parties).  The cross-

complainants asserted that they were entitled to indemnification from Legacy Partners in

connection with Woodson's claims against them.

The Woodson action was dismissed by the Superior Court following entry of judgment

against Woodson and a request for dismissal without prejudice by the cross-defendants.  On

November 23, 2003, the California Court of Appeal reversed and remanded.  Butcher, Legacy

2323, Legacy 387, and Legacy Partners tendered the matter to Gulf and sought coverage for

the "Loss" incurred in connection with the Woodson action and the appeal.  Gulf denied

coverage.  Plaintiffs in this suit seek to recover the costs of defending the Woodson action

and the appeal, an amount exceeding $500,000, from Gulf.

"Pogue" matter

In 1965, A. Mack Pogue ("Pogue"), who apparently lives in Texas, formed Lincoln

Property Company ("Lincoln") to develop, own, and manage commercial and residential real

estate properties.  A few years later, Pogue hired Butcher, and later gave him the

responsibility of managing Lincoln's business in California and certain other West Coast

areas (including various "Legacy" entities).  Pogue and Butcher operated jointly for

approximately 30 years through a maze of approximately 500 interrelated corporations,

partnerships, limited liability companies, joint ventures, and other business entities.  Around

1998, Pogue and Butcher apparently had some sort of falling-out.

In March 1999, Pogue and other Pogue individuals filed suit in Dallas County, Texas,

against Butcher and numerous other affiliated individuals, corporations, and limited

9

United States District Court

For the Northern District of California

1   partnerships, accusing Butcher of attempting to take control of the Lincoln properties in

2   California.  In April 1999, the parties settled that action by executing the "Rule 11 Agreement."

3    In March 2001, Butcher and Legacy Partners sued Pogue and various Legacy- and

4   Pogue-related persons and entities.  That suit, <u>Butcher v. Pogue</u>, was filed in San Francisco

5   County Superior Court, and sought declaratory relief under the Rule 11 Agreement.

6    In April 2001, A. Mack Pogue, A. Mack Pogue, Inc., D.B. Pogue, B.M. Pogue, J.B.

7   Pogue, and B.J. Pogue (individually and as trustee for Pogue Children 1998 Lincoln Trust),

8   filed a cross-complaint against Butcher and Legacy Partners in <u>Butcher v. Pogue</u>, alleging

9   breach of the Rule 11 agreement and breach of fiduciary duty, and seeking specific

10  performance, an accounting, and declaratory relief.  Basically, the cross-complaint alleged

11  wrongful conduct by Butcher (as general partner of various Pogue/Butcher-related limited

12  partnerships) against Pogue (as limited partner of those partnerships).  The action was

13  dismissed with prejudice in September 2003, after commencement of trial, pursuant to a

14  stipulation of settlement.

15   The Legacy plaintiffs seek to recover the costs of defending the cross-complaint in

16  <u>Butcher v. Pogue</u>.  They claim those costs exceed $6,000,000.  They also paid costs in

17  settlement of the action, and seek to recover those as well.

18             "Essex" matter

19   The "Essex" claim arose out of the development of the Waterford Place Apartments in

20  San Jose, California.  Essex Portfolio, L.P. and Essex Property Trust, Inc. (collectively,

21  "Essex"), contracted with Archer Limited Partnership to build a multi-unit apartment complex

22  and sell it to Essex.  Part of the agreement included a provision that Archer would cause the

23  property to be constructed in a non-negligent manner.  The Legacy Partners and Essex also

24  entered into an agreement that included a formula to calculate the price at which Waterford

25  would be sold to Essex after the initial management period.  Archer built the complex and sold

26  it to Essex.

27   Essex also contracted with Legacy Management Company for Legacy Management to

28  manage the apartment complex.  Essex and Legacy Management entered into a "co-

United States District Court

For the Northern District of California

1   management agreement," which included leasing activities for the residential units.  Because

2   it was dissatisfied with the way in which Legacy was managing Waterford, Essex terminated

3   the Legacy partners as manager, and in May 2001, Legacy filed suit against Essex for breach

4   and anticipatory breach of the agreements.  Legacy also sought rescission and specific

5   performance of the contract.  That suit, <u>Archer Limited Partnership v. Essex Portfolio</u>, was

6   filed in San Francisco County Superior Court.

7          In June 2001, Essex filed cross-claims against the Legacy Partners entities, alleging

8   breach of contract, breach of fiduciary duty, and various other torts, and seeking exclusive

9   possession of the Waterford property.  In addition, Essex alleged that Archer had breached its

10  duty to construct the Waterford property in a good, workmanlike, and non-negligent manner,

11  and that the result was numerous construction defects.  Essex sought damages for the cost to

12  repair the damage to Waterford.  Pursuant to the agreement between the parties, the case

13  was tried before a court-appointed judicial referee, who awarded damages to the Legacy

14  partners on their claims, and also awarded Essex damages in the amount of $1,307,907

15  against Legacy on Essex's construction defect damage claim.

16         Plaintiffs now seek coverage under the 2001 Gulf policy for this damage award and the

17  defense costs incurred by Legacy.

18         2.     The motion for summary judgment on the counterclaims

19         Each of the four counterclaims alleges a different basis for rescission of the policy –

20  breach of warranty, concealment, material misrepresentation, and fraud – but each is based

21  on the same facts.  Gulf contends that plaintiffs falsely represented that there were no claims

22  pending against them – and that they had no information about any potential claims – at the

23  time they applied for the insurance policy and as of the time it was issued.  Gulf asserts that at

24  the time it issued the policy, Legacy and its general partners and officers and directors had

25  knowledge of Woodson's dispute with Legacy, and information that the dispute might turn into

26  a "Claim" as defined in the policy.

27         Gulf argues that rescission of the policy is appropriate because Legacy's responses to

28  questions Nos. 10 and 11 in the policy application were false, and therefore in breach of their

1    warranty that the statements were true, and/or because Legacy did not notify Gulf of certain

2    material changes to the answers to the questions.  Gulf bases this argument on the following,

3    much of which it learned only after Legacy submitted its claims for payment of defense costs

4    to Gulf:

5         In March 1999, Woodson notified Legacy of his claimed right to participate in a new

6    partnership formed by Legacy (Legacy 2323).[4]  In April 1999, Woodson and Legacy general

7    partner Rossi further communicated regarding the dispute between Woodson and Legacy.

8         In May 1999, following a meeting with Woodson to discuss the dispute, Rossi advised

9    the other general partners of Legacy that Woodson believed Legacy was unethical and that

10   Woodson would likely try to raise legal issues in an attempt to be allowed to participate.

11        In July 1999, Rossi wrote Woodson regarding Woodson's inquiry concerning his right

12   to participate in a partnership.  In October 1999, Legacy received a letter from an attorney

13   retained by Woodson, referencing the discussions between Woodson and Legacy about

14   Woodson's "not having been afforded a right to participate in a recently formed partnership."

15   On that letter, Rossi wrote a note to other Legacy general partners (Hays and Henry) stating,

16   "[W]e need to provide the information or be prepared for litigation."

17        In December 1999, Legacy's attorney Jonathan Cox wrote Woodson's attorney to

18   confirm a meeting scheduled for the following week, and stated that his client would attend the

19   meeting to discuss "outstanding matters for settlement purposes."  Three weeks later, Rossi

20   proposed to Woodson that the two of them, plus Hays, hold another meeting – without

21   attorneys – that would be governed by California Evidence Code §§ 1152 and 1154 (which

---

22

23        [4] A development known as "St. Francis Place," located at Third and Folsom Streets in San
24   Francisco, was owned by the St. Francis Place Limited Partnership.  The two general partners
     of that limited partnership were Legacy 387 and another limited partnership, Taysan Lincoln
25   Associates, or "Taysan." In order to refinance the St. Francis Place property, the general partners
     of Legacy 387 formed another limited partnership, Legacy 2323, to buy out Taysan.  Rossi
26   asserts in his declaration that Legacy 387 and Legacy 2323 together "succeeded in refinancing
     the project, preventing it from being lost in a pending foreclosure action and bankruptcy."
27   Woodson's complaint was that he was not offered a limited partnership interest in Legacy 2323
     – that he was shut out of the partnership opportunity – and also that the managing general
28   partners used his security interest as a limited partner in Legacy 387 as part of the security for
     the refinancing.

12

United States District Court

For the Northern District of California

1   relate to "negotiations for the settlement of a claim").  Rossi suggested that the purpose of

2   such a meeting would be to "answer any questions regarding the St. Francis Place refinancing

3   transaction" and "perhaps, resolve any outstanding issues."

4       In January 2000, Rossi and Hays did in fact meet with Woodson to discuss the

5   refinancing and Woodson's claimed right to participate in the new partnership.  Following that

6   meeting, Hays prepared a memorandum stating, among other things, that Woodson "stated

7   that he believes we should have offered these deals to him and he has a claim."  Hays stated

8   in his deposition that he added this sentence to the memo at Rossi's request.

9       By letter dated February 16, 2000, Woodson's attorney proposed to Legacy a tolling

10  agreement as a condition to continuing the negotiations (and as an alternative to Woodson's

11  "not filing a court action").  On that letter, Rossi wrote what appears to be an instruction to

12  tender the Woodson matter under the "GPL" policy.  Gulf contends that this reference to the

13  GPL policy is a reference to the policy that is the subject of the present action, which had at

14  that time not yet been approved by Gulf.

15      Legacy claims that as of the date that Rossi wrote the note, Legacy had not yet

16  submitted the policy application to Gulf.  Because Rossi's notes are not dated, however, there

17  is no way of knowing when the notes were written.  Rossi's deposition testimony suggests that

18  he wrote the notes soon after receiving the letter, but he did not provide a specific date.  There

19  is a hand-written date at the bottom of the document, but Rossi stated that this date is not in

20  his handwriting.

21      On March 23, 2000, Woodson's attorney wrote Legacy's attorney making a formal

22  written "demand for settlement of his claim against Legacy Partners 387 . . . and its individual

23  partners."  Six days later, on March 29, 2000, Legacy's broker submitted the completed policy

24  application to Gulf for approval.

25      Gulf claims that this evidence shows that Legacy had knowledge of a potential claim,

26  which should have been reported to Gulf in the policy application.  Gulf argues that rescission

27  is appropriate, whether on a breach of warranty theory, concealment theory, material

28  misrepresentation theory, or fraud theory, because Legacy falsely represented in the

United States District Court

For the Northern District of California

1    application for the 2000 policy that there were no pending claims and warranted that no

2    general partner or officer or director of a subsidiary had "knowledge or information of any fact,

3    circumstance, or situation which might give rise to a Claim under the proposed Policy."

4    Gulf contends that Legacy was aware of the dispute with Woodson, which Legacy itself had

5    characterized as a "Claim."  Gulf argues that even if Legacy can argue that this was not a

6    "Claim" under the definition in the policy, because no suit had been filed, Legacy's failure to

7    mention this dispute was nonetheless a breach of its warranty that it had no "knowledge or

8    information of facts, circumstances, and situations which might give rise to a Claim" under the

9    proposed policy.  By the terms of the policy, and under California law, an affirmative warranty

10   is a condition precedent to the validity of an insurance policy; if the warranty is broken in its

11   inception, the policy never attaches to the risk that it purports to cover.  <u>Bennett v.</u>

12   <u>Northwestern Nat'l Ins. Co.</u>, 84 Cal. App. 130, 135-36 (1927).

13          Gulf also asserts that this failure to disclose pertinent information was "concealment."

14   Under California law, "concealment, whether intentional or unintentional, entitles the injured

15   party to rescind insurance."  Cal. Ins. Code § 331.  Concealment is defined as "neglect to

16   communicate that which a party knows or ought to communicate."  Cal. Ins. Code § 330.

17   Here, Gulf contends that Legacy failed to communicate that Legacy was attempting to

18   negotiate a "settlement" of Woodson's claims, and failed to communicate any change in the

19   information as required by the application between the time they submitted the application

20   and the time the policy was issued.

21          Gulf argues further that Legacy's representations that it had no information about any

22   matters that might result in a Claim constituted a material misrepresentation.  Material

23   misrepresentation or concealment of such facts are grounds for rescission of a policy.

24   <u>Thompson v. Occidental Life Ins. Co.</u>, 9 Cal. 3d 904, 916 (1973); <u>see</u> Cal. Ins. Code § 359.

25   The fact that an insurer has requested answers to specific questions in an application for

26   insurance is sufficient to establish materiality as a matter of law.  <u>Thompson</u>, 9 Cal. 3d at 916.

27          Finally, Gulf contends that an intentional and fraudulent misrepresentation in an

28   application for insurance entitles the insurer to rescind the policy.  "[A]n intentional and

14

United States District Court

For the Northern District of California

1  fraudulent omission, on the part of one insured, to communicate information of matters proving

2  or tending to prove falsity of a warranty entitles the insurer to rescind." Cal. Ins. Code § 338.

3  Gulf argues that Legacy made false responses when it completed the application, and that

4  Legacy knew the responses were false, noting that Rossi acknowledged that Woodson had a

5  "claim" against Legacy and directed that the "claim" be submitted under the policy long before

6  Legacy had even submitted the application.

7      In opposition, Legacy argues that triable issues of fact preclude summary judgment on

8  Gulf's counterclaims for rescission, for four reasons.  First, Legacy contends that Legacy

9  Partners truthfully answered Gulf's questions as of the date that coverage commenced, which

10  Legacy says was February 1, 2000, the date of the insurance binder, and also the "coverage

11  date" indicated on the face of the policy.  Legacy contends that under California law, a binder

12  "shall be deemed an insurance policy for the purpose of proving that the insured has the

13  insurance coverage specified in the binder (citing Cal. Ins. Code § 382.5).

14      The court finds, however, that Legacy's representations and warranties must be judged

15  as of April 27, 2000, the date the policy was issued.  California Insurance Code § 382.5 does

16  not apply to policies of $1 million or more; moreover, it defines a "binder" as a writing that

17  temporarily obligates the insurer to provide insurance coverage pending issuance of the

18  insurance policy.  There is no dispute that the binder was in place on February 1, 2000;

19  however, the binder clearly stated that issuance of the policy was subject to Gulf's receipt and

20  acceptance of Legacy's completed application, and the application itself stated that the policy

21  was issued in reliance on the representations and warranties in the application.

22      The evidence shows that the Woodson matter was a "Claim" at least as of March 23,

23  2000, and that the completed policy application was not submitted to Gulf by Legacy's broker

24  until March 29, 2000.  The actual date of issuance of the policy was April 27, 2000.

25      Second, Legacy contends that Woodson's "inquiries" did not rise to the level of a

26

27

28

15

United States District Court

For the Northern District of California

1   "Claim,"[5] and that there was nothing in his inquiries that Legacy was required to disclose to

2   Gulf.  According to Legacy, as a multi-billion dollar enterprise with hundreds of limited

3   partnerships and thousands of limited partners, Legacy Partners could simply not reasonably

4   be expected to take one limited partner's requests for information about his partnership

5   interests as a specific indication of a potential "Claim."

6        The undisputed evidence shows, however, that Woodson was not merely "requesting

7   information."  In May 1999, Rossi, a general partner, had predicted that Woodson would "try to

8   raise legal issues in an attempt to be allowed to participate" in the Legacy 2323 partnership.

9   Legacy and Woodson continued to communicate about this dispute throughout 1999, and in

10  December 1999, Legacy proposed to Woodson that the parties negotiate Woodson's claim.

11  Woodson requested that those negotiations be subject to California Evidence Code §§ 1152

12  and 1154 (referencing settlement of a "claim").  Hays wrote in a memorandum following the

13  January 14, 2000, meeting that Woodson believed he had a claim.  Woodson's attorney

14  proposed a tolling agreement in February 2000, and on March 23, 2000, Woodson presented

15  a written demand for "settlement of a claim" against Legacy 387 and its individual partners.

16       Third, Legacy contends that Gulf had a duty to investigate any questions raised by

17  Legacy's application and financial statements.  Legacy submits that its financial statements

18  disclosed the existence of "controversies, claims, and pending legal actions relating to

19  matters common in the real estate industry" and that the insurance application disclosed

20  pending "general liability & workers' compensation and other claims in the ordinary course of

21  business."  Legacy contends that its reference to "claims in the ordinary course of business"

22  should have put Gulf on notice that there might be pending claims.  Legacy argues that Gulf, in

23  effect, waived its right to information because it neglected to make the necessary inquiries.

24       The court is not persuaded by Legacy's argument.  Gulf provides evidence showing

25  that the financial statements that Legacy refers to were for the year ending June 30, 1998, and

26

27       [5] According to Legacy, Woodson was simply exercising his right as a limited partner to
28  "inspect and copy" the "partnership books" and to obtain "true and full information of all things
    affecting the partnership."

16

1   were thus more than a year and a half old.  Moreover, the financial statements simply refer to

2   controversies and legal actions relating to matters common in the real estate industry, and

3   were prepared in the course of Legacy's general operations from a financial standpoint, not

4   for obtaining insurance.

5          Legacy's contention that Gulf waived its right to information is also without merit, as an

6   insurer will be found to have waived its right to information under Insurance Code § 336 only

7   where it had information that differed from the representations in the application.  See

8   Anaheim Builders Supply Inc. v. The Lincoln Nat'l Life Ins. Co., 233 Cal. App. 2d 400 (1965);

9   see also Jaunich v. Nat'l Fire Ins. Co., 647 F.Supp. 209, 212 (N.D. Cal. 1986) (under

10  California Insurance Code section 336, "[a]n insurer waives its right to receive withheld

11  information only if it fails to make inquiries as to such information when the information is

12  'distinctly implied' in other facts that are disclosed").  Legacy has provided no evidence that

13  Gulf had any information that contradicted Legacy's answers to the questions in the

14  application.

15         Fourth, Legacy argues that Gulf has provided no evidence that any further disclosures

16  by Legacy Partners would have changed Gulf's decision to issue the policies.  Legacy

17  contends that the information that was allegedly withheld must be found to be "material."

18  Legacy argues that Gulf's Rule 30(b)(6) witnesses, designated to testify concerning the

19  underwriting process, and about the reasons Gulf now seeks to rescind the policy, were

20  unable to provide any testimony concerning what degree of disclosure about Woodson would

21  have changed Gulf's decision to issue the policy.

22         Under California law, "[m]ateriality is to be determined . . . solely by the probable and

23  reasonable influence of the facts upon the party to whom the communication is due . . . . "  Cal.

24  Ins. Code § 334.  In interpreting this provision, the California Supreme Court has indicated

25  that "[t]he fact that the insurer has demanded answers to specific questions in an application

26  for insurance is in itself usually sufficient to establish materiality as a matter of law."

27  Thompson, 9 Cal. 3d at 915-16.  While some California courts have expressed the view that

28  materiality may involve questions of fact, and have suggested inquiring into the nature of the

United States District Court

For the Northern District of California

1    information withheld and the likely practice of the insurance company had the concealed facts

2    been truthfully disclosed, to determine whether the true facts – if known – would have made the

3    contract less desirable to the insurer, see, e.g., Merced County Mut. Fire Ins. Co. v. State of

4    California, 233 Cal. App. 3d 765, 772-74 (1991); Old Line Life Ins. Co. v. Superior Court, 229

5    Cal. App. 3d 1600, 1604-05 (1991); Imperial Cas. & Indem. Co. v. Sogomonian, 198 Cal.

6    App. 3d 169, 181-82 (1988), the consensus seems to be that where the facts are undisputed

7    and reasonable minds could not disagree on their impact, materiality may be determined as a

8    matter of law.  See, e.g., Mitchell v. United Nat'l Ins. Co., 127 Cal. App. 4th 457, 475-76

9    (2005).

10        Here, the court finds that Gulf has established material misrepresentation as a matter

11   of law.  Gulf requested that Legacy disclose in the policy application any "Claim" or any fact,

12   situation, or circumstance that could lead to a "Claim."  Thus, the fact that a claim had been

13   made or was likely to be made was plainly material, as Gulf had requested such information in

14   the policy application.  As Gulf notes, the existence of circumstances that can lead to litigation

15   are material to an insurer's decision to issue a policy, particularly when the information has

16   been specifically requested as part of the insurance application.  See Jaunich, 647 F.Supp. at

17   211.  The question whether the true facts, if known to Gulf, would have made the contract less

18   desirable can be decided as a matter of law where there are no disputed material facts.

19   While Gulf has not provided an affirmative declaration stating that true answers to the

20   questions in the application would have been material to its  underwriting decision, common

21   sense tells us it is so.  Moreover, plaintiffs have not provided any evidence that creates a

22   disputed issue of material fact with regard to this claim.

23        The court finds that the motion must be GRANTED as to the counterclaims for breach

24   of warranty, concealment, and material misrepresentation.  The evidence provided by Gulf

25   establishes that at least some of the general partners of the insured Legacy partnerships had

26   knowledge or information of facts that might give rise to a claim under the policy, and that

27   Legacy failed to provide Gulf with that information before the policy was issued.

28        In particular, the evidence shows that well before Gulf received the application from

United States District Court

For the Northern District of California

1   Legacy, Rossi had written that Legacy needed to provide the requested information or

2   prepare for litigation; the parties had held meetings that related to "negotiations for settlement

3   of a claim;" Hays had written that Woodson believed "we should have offered these deals to

4   him and he has a claim;" and Woodson's attorney had sent Legacy a written demand.

5       As part of its opposition, Legacy offers a declaration from Rossi, in which he states that

6   he never thought Woodson had a claim or that Woodson would file suit, so long as Legacy

7   provided him with the requested information.  Although Legacy argues that this creates a

8   disputed issue of fact with regard to whether Woodson's complaints could be considered a

9   "Claim,"  the court disagrees, and finds moreover that Rossi's statements do not create a

10  triable issue with regard to the other evidence provided by Legacy.

11      Finally, the finds that the counterclaim for fraud must be DENIED, because there is

12  insufficient evidence that Legacy provided false information with the intention of inducing

13  reliance on that false information.  See South Tahoe Gas Co. v. Hofmann Land Improvement

14  Co., Inc., 25 Cal. App. 3d 750, 765 (1972).  Nevertheless, the court's findings with regard to

15  the counterclaims for breach of warranty, concealment, and material misrepresentation,

16  above, permit rescission of the policy.

17      3.    The motion for summary judgment on the breach of contract claims

18      Gulf also seeks summary judgment on each of plaintiffs' claims for breach of contract.[6]

19  Having found that the policy should be rescinded, the court need not reach the breach of

20  contract claims, but does so in order to complete the record.

21                      "Woodson" claim

22      Gulf argues that no coverage exists for the "Woodson" claim for two main reasons.

23  First, Gulf contends that the claim was not made and reported during the policy period.  The

24  policy provides coverage for "Loss . . . as the result of any Claim first made against the

25  General Partners and reported in writing to the Insurer during the Policy Period."  The policy

26  _____

27      [6]  The First Amended Complaint pleads a first cause of action for breach of contract
    regarding the "Woodson" claim and cross-claim, and a second cause of action for breach of

28  contract regarding the "Pogue" cross-claim.  The Supplemental Complaint pleads a fifth cause
    of action for breach of contract regarding the "Essex" claim.

                                19

United States District Court

For the Northern District of California

period of the 2000 policy was February 1, 2000, to February 1, 2001.  The latest the "Woodson" claim was first made was March 23, 2000, the date Woodson's attorney submitted the written demand for money to Legacy (although Gulf contends that the "Woodson" claim was made prior to March 23, 2000).  Legacy first gave notice of this claim to Gulf on February 15, 2001, after the expiration of the policy period.  Gulf claims that because the "Woodson" claim was not first made and reported during the policy period of the 2000 policy, coverage for the loss is not available.

In opposition, Legacy asserts that Gulf is wrong when it says that both the claim and the notice of claim must come within the same policy period.  Legacy contends that if either the March 23, 2000, letter or the filing of the January 2001 complaint was the first "Claim," it came within the first policy period, and Legacy Partners timely reported it within 30 days after the policy period expired.  If the service of the complaint on Legacy in February 2001 was the first "Claim," Legacy Partners timely reported it within a week of its service.

The court agrees with Gulf that the "Woodson" claim is barred because it was not made and reported during the policy period, as required by the policy.  Legacy's reliance on the "notice" provision is misplaced, as Gulf is not asserting that Legacy failed to comply with the notice provisions of the policy, but is instead asserting that the "Woodson" claim was never within the scope of coverage because it was not made and reported during the policy period as required by the insuring agreement.

Under California law, coverage in a "claims-made" policy is determined by claims made within the policy period, regardless of when the events that caused the claim to materialize first occurred.  See Pension Trust Fund v. Fed. Ins. Co., 307 F.3d 944, 955 (9th Cir. 2002).  A "claims-made-and-reported" policy is a "claims-made" policy that requires that claims be reported during the policy period.  Id.  A provision requiring that the claim be both made and reported during the policy period will be enforced.  Id. at 955-56.  Moreover, the notice-prejudice rule – the requirement that an insurer show that it was substantially prejudiced by the insured's failure to give sufficient notice – applies to a "claims-made" policy with no reporting requirement, but does not apply to a "claims-made-and-reported" policy.  Id. at 956-

57.

Second, Gulf asserts that even if the "Woodson" claim had been both made and reported during the policy period, coverage is excluded by the terms of the policy.  Section IV(6) of the policy contains a "General Partner" exclusion – Exclusion 6, referred to as the "insured vs. insured exclusion."

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any of the General Partners:
>
> (6)      brought or maintained by or on behalf of the Insured Partnership and/or General Partners or by any security holder of the Insured Partnership or Organizational General Partner whether directly or derivatively except:
>
>          (a)      a Claim that is brought and maintained by security holders who are acting totally independently of, and totally without the solicitation, assistance, participation or intervention of any General Partner or the Insured Partnership,
>
>          (b)      a Claim for Wrongful Employment Practices,
>
>          (c)      a Claim that is brought and maintained by or on behalf of any General Partner for contribution or indemnity which is part of or results directly from a Claim which is otherwise covered by the terms of the Policy.

In other words, any "Claim" brought by a general partner against a general partner is excluded from coverage, unless one of the limited exceptions applies.  Section II(G)(1) of the policy defines "General Partner," with respect to any Insured Partnership that is a partnership (as opposed to a corporation), as

>          (a)      any Organizational General Partner,
>
>          (b)      any natural person who was, now is or shall hereafter be a general partner of the Insured Partnership,
>
>          (c)      any natural person who was, now is or shall hereafter be duly appointed or elected to a management position with the Insured Partnership in accordance with the partnership agreement for the Insured Partnership,
>
>          (d)      any natural person who was, now is or shall hereafter be a director, officer, employee or general partner of any Organizational General Partner, but only with respect to such natural person acting on behalf of such Organization General Partner in its fiduciary capacity as a general partner of the Insured Partnership.

Gulf argues that Woodson qualifies as a "General Partner" under the definition in

United States District Court

For the Northern District of California

1    section II(G)(1)(b) of the policy, because he is a "natural person who was, now is, or shall

2    hereafter be a general partner of the Insured Partnership."  Gulf also asserts that Legacy 387

3    Limited Partnership is an "Insured Partnership" under the policy definitions.  Thus, Gulf argues,

4    Woodson's claim – a claim made against the General Partners brought by a "General

5    Partner" – is not covered under the policy.

6           In opposition, Legacy asserts that Gulf improperly relies on the definition of "General

7    Partner" in section II(G)(1)(b) of the policy, and gives no consideration to the definition in

8    section II(G)(1)(d), which describes a "General Partner" as any natural person who has ever

9    been a general partner of any Organizational General Partner, "but only with respect to such

10   person acting on behalf of such Organizational General Partner in its fiduciary capacity as a

11   general partner of the Insured Partnership."  According to Legacy, Gulf fails to consider

12   whether Woodson was acting "on behalf of" any Legacy Partners entity.  Legacy also asserts

13   that Gulf improperly failed to consider whether Woodson was acting "totally independently of,

14   and totally without the solicitation, assistance, participation, or intervention of any General

15   Partner or the Insured Partnership," as provided in exception (a) to Exclusion 6, set forth

16   above.

17          The court finds that the "Woodson" claim is barred by the operation of Exclusion 6

18   because Woodson was at one time a "General Partner" under the definition in the policy.[7]  The

19   court does not agree that the definition is inherently ambiguous.  It is true, as Legacy argues,

20   that section II(G)(1)(b) of the policy conflicts with section II(G)(1)(d), and that sections II(G)(1)(a)

21   through (d) are joined by commas, without the word "and" or "or" to indicate whether they apply

22   conjunctively or disjunctively.  Nevertheless, the court finds the provision clear, and not

23   susceptible to more than one interpretation.  The definition includes four sub-parts defining the

24   distinct classes of persons and entities that fall within the scope of "General Partner."  It would

25   be impossible for one person or entity to satisfy all the subparts, which are intended to be

26   _____

27          [7]  There is no requirement in this "insured vs. insured" exclusion or in the definition of
     "General Partner" that the person have been a general partner at the time of the "Wrongful Acts"
28   or at the time of the "Claim."  Moreover, exception (a) to Exclusion 6 applies to claims by security
     holders, not to claims by general partners, all of which are excluded.

United States District Court

For the Northern District of California

considered in the disjunctive.  Once one subpart of the definition has been satisfied – in this case (b) – there is no need to consider the others.

The "Pogue" cross-claim

Gulf argues that no coverage exists for the "Pogue" cross-claim, for two reasons.  First, Pogue and the other "Pogue" parties were general partners of various Legacy partnerships, and were therefore "General Partners" as defined in the policy.  Thus, Gulf argues, coverage for this claim is excluded under Exclusion 6, just as is coverage for the "Woodson" claim.  In opposition, Legacy makes the same arguments it made in connection with the argument regarding the "Woodson" claim.  For the reasons stated above, the court finds that coverage for this claim is excluded.  In addition, the cross-complainants in the "Pogue" claim were also security holders of various Legacy entities.  Since they brought a claim against the Insured partnership and the General Partners, and were not acting "totally independently of, and totally without the solicitation, assistance, participation, or intervention of any General Partner" – e.g., Pogue and the other general partners – coverage is excluded pursuant to Exclusion 6.

Second, Gulf contends that coverage for the "Pogue" claim is excluded based on Exclusion 5, which excludes Loss for any claim

> (5)     based upon, arising out of, directly, or indirectly resulting from, in consequence of, or in any way involving any litigation against any General Partners or the Insured Partnership on or prior to the Pending and Prior Litigation Date set forth in Item 9 of the Declarations, or any fact, circumstance, or situation    underlying or alleged therein.

The "pending and prior litigation date" in the policy was February 1, 2000.  Gulf contends that the 1999 "Pogue" Texas suit was litigation against "any General Partners or the Insured Partnership" because numerous individuals who were general partners of the Legacy entities as well as numerous Legacy partnerships were named as defendants.  Gulf notes that the "Pogue" claim (the claim for recovery of costs of defending against the cross-claim in the March 2001 Butcher v. Pogue suit in San Francisco Superior Court) makes specific reference to the 1999 "Pogue" litigation, and that the Rule 11 Agreement (also mentioned in the March 2001 suit) settled the Texas "Pogue" suit.  Gulf contends that the allegations in the March 2001 suit are the direct result of, and could not have been made without, the 1999 "Pogue" Texas

23

United States District Court

For the Northern District of California

1  suit.  Thus, Gulf asserts, this claim fits squarely within the scope of Exclusion 5.

2  Legacy contends that the "pending and prior litigation" exclusion does not apply

3  because no factual nexus exists between the 1999 Texas lawsuit and the cross-complaint in

4  Butcher v. Pogue, filed in 2001.  Legacy asserts that even though the Pogue cross-complaint

5  alleges breach of the Rule 11 Agreement, the facts alleged relate to intervening business

6  decisions.  Legacy claims that the Rule 11 Agreement "created entirely new rights and duties

7  between its parties that entirely replaced the disputes of the 1999 Pogue suit."

8  Exclusion 5 applies, however, not only to claims "arising out of" prior litigation, as

9  Legacy seems to argue, but also to claims "directly or indirectly resulting from, in consequence

10  of, or in any way involving any litigation against any general partners."  The "Pogue" claim,

11  which alleges breach of the Rule 11 Agreement that resolved the 1999 Texas "Pogue" lawsuit,

12  at the very least "indirectly results from" or "in any way involves" that prior litigation.  Thus,

13  Exclusion 5 bars coverage for the "Pogue" claim.

14  "Woodson" cross-claim

15  In the "Woodson" cross-claim, the Pogue parties were named as defendants, and

16  brought a cross-claim against Legacy seeking indemnification for the "Woodson complaint."

17  Legacy then sought coverage under the 2001 policy in connection with the cross-claim.  Gulf

18  contends that coverage for the Woodson cross-claim is excluded under Exclusion 6 – the

19  "General Partner" exclusion – because the "Pogue" parties were General Partners of Legacy.

20  For the reasons discussed above, the court finds that coverage for the "Woodson"

21  cross-claim is excluded under Exclusion 6.

22  "Essex" claim

23  Gulf argues that coverage of the "Essex" claim is excluded under Exclusion 1(a), which

24  provides that the Insurer shall not be liable to make any payment for any Loss in connection

25  with any Claim made against any of the General Partners, "libel, slander, bodily injury,

26  sickness, disease or death of any person, or any damage to or destruction of any tangible

27  property including the loss thereof . . . ."  Gulf asserts that because the "Essex" litigation

28  involves a claim for damages for shoddy and negligent construction – "damage to or

24

destruction of . . . tangible property" – it falls within Exclusion 1(a).

In opposition, Legacy argues that the policy covers the "Essex" suit because it concerned the Legacy Partners' alleged lack of supervision over others – a claim that the Legacy Partners negligently supervised the work of subcontractors on a decking system in an apartment complex – not a claim that Archer itself damaged property.  Legacy asserts that coverage exists because the policy insures against any "wrongful act," which is defined as "any error . . . omission, neglect, or breach of duty . . . "

Legacy also contends that Gulf has admitted for years that potential coverage existed for at least a portion of the "Essex" suit, yet never reimbursed any of the Legacy Partners' defense costs and now refuses to make a final coverage determination because of its rescission claim.  Legacy argues that under California law, the assertion of rescission does not relieve an insurer of its duty to fund a defense, because "until such time [as] the insurer prevails [in establishing rescission], its duty to defend continues" (citing Maryland Cas. Co. v. Nat'l Am. Ins. Co., 48 Cal. App. 4th 1822, 1833 (1996).

The "Essex" claim alleged damage to property, and is therefore excluded.  Exclusion 1(a), which excludes coverage for any claim against the general partners "for any damage or destruction of any tangible property," does not limit the exclusion to claims against the general partners for damage actually physically caused by the general partners.  Essex brought a claim against the general partners, alleging that property was damaged and that the general partners were legally responsible.  The Superior Court entered judgment against the general partners for that damage.  The general partners acted as the developers of the project and as such were responsible for its construction and were held liable for the damage to the property.

In claiming that Gulf had a duty to continue to defend the "Essex" claim until the claim for rescission is resolved, Legacy appears to be ignoring the language on page 1 of the policy that states, "This policy does not provide for any duty by the insurer to defend any general partner."  Moreover, there is no evidence that Gulf ever admitted that any part of the "Essex" claim was covered.  Rather, Gulf reserved its rights pending receipt of information about the claim – and when informed that the claim involved damage to property, advised Legacy that

25

United States District Court

For the Northern District of California

1   Exclusion 1(a) barred coverage.

2       The court finds that the motion must be GRANTED as to the "Woodson," "Pogue," and

3   "Essex" claims, for the reasons argued by Gulf.  In particular, the court finds that coverage of

4   the "Woodson" and "Pogue" claims is barred by Exclusion 6, that coverage of the "Pogue"

5   claim is also barred by Exclusion 5, and that coverage of the "Essex" claim is barred by

6   Exclusion 1(a).

7       4.      The motion for summary judgment on the insurance bad faith claim

8   Gulf argues that summary judgment should be granted on the insurance bad faith claim

9   because plaintiffs cannot establish that Gulf unreasonably withheld benefits.  To establish a

10  breach of the implied covenant, plaintiffs must show that benefits due under the policy were

11  withheld, and that the reason for withholding the benefits was unreasonable or without proper

12  cause.  Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1151 (1990); see also Gruenberg v.

13  Aetna Ins. Co., 9 Cal. 3d 566, 574 (1973) (to recover on the tort of "bad faith," plaintiffs must

14  show that the defendant insurance company unreasonably withheld policy benefits).

15      An insurer's denial of a claim is not considered unreasonable as a matter of law if there

16  is a genuine dispute as to the insurer's liability.  Fraley v. Allstate Ins. Co., 81 Cal. App. 4th

17  1282, 1291-92 (2000); see also Guebara v. Allstate Ins. Co., 237 F.3d 987, 992-94 (9th Cir.

18  2001).  Here, Gulf's decision to deny payment of the underlying claims was reasonable in light

19  of the policy language, the facts known, and the case law.

20      Legacy contends that Gulf cannot disprove "bad faith" as a matter of law because even

21  if a "genuine dispute" existed (which Legacy rejects), it would at most affect bad faith claims

22  regarding certain coverage determinations.  Legacy argues that "case law does not preclude

23  a bad faith claim even in the absence of coverage," and that bad faith liability will exist in many

24  situations even where the policy does not provide coverage.  For example, Legacy asserts, an

25  insurer may be liable for breach of the implied covenant for improper claims handling, even

26  where there is no breach of a specific provision of an insurance contract.

27      The court finds, however, that Legacy has failed to demonstrate the existence of a

28  triable issue that Gulf acted in bad faith.  Legacy cites Guebara, where the court stated that

1   bad faith liability can attach in situations involving biased investigations where the insurer is

2   guilty of misrepresenting the nature of the investigatory proceedings, the insurer's employees

3   lie during depositions or to the insured, the insured dishonestly selects its experts, the

4   insurer's experts are unreasonable, or the insurer failed to conduct a thorough investigation.

5   Guebara, 237 F.3d at 996.  However, Legacy has not asserted that Gulf conducted a biased

6   investigation, and none of the circumstances listed in Guebara are alleged by Legacy to have

7   occurred.  Nor has Legacy provided any evidence that they did occur.

8         Instead, Gulf was provided with information that demonstrated that certain exclusions

9   applied – the information that Woodson and Pogue were former general partners of Legacy,

10  that the Pogue claim indirectly resulted from or in any way involved a prior litigation, and that

11  the Essex claim involved property damage.  According to Gulf, this was all the information it

12  needed to determine that the exclusions applied.  The Ninth Circuit held in Guebara that a bad

13  faith claim can be dismissed on summary judgment where there exists a genuine issue as to

14  the insurer's liability.  Id. at 992.  Because there is more than a genuine issue as to Gulf's

15  liability under the policies in connection with the underlying claims, Legacy's bad faith claims

16  must be dismissed.

17        The court finds that the motion must be GRANTED.  Legacy has not provided any

18  evidence to create a triable issue of fact with regard to whether Gulf's denial of coverage was

19  reasonable under the circumstances.

20                                   **CONCLUSION**

21        In accordance with the forgoing, the court hereby GRANTS defendants' motion for

22  summary judgment on the counterclaims for breach of warranty, concealment, and material

23  misrepresentation.  The policy is ordered rescinded.  Cal. Ins. Code § 359.  The court also

24  GRANTS summary judgment on the first, second, fourth, and fifth causes of action of the First

25  Amended Complaint.

26        The parties raised a question in their papers regarding the cost of rescission. The

27  record is not sufficiently clear, however, for the court to determine what rescission will cost

28  defendants.  The parties shall meet and confer in an effort to resolve this dispute.  If unable to

United States District Court
For the Northern District of California

1  stipulate, they shall brief the issue, with the opening brief to be filed no later than August 3,

2  2005, the opposition to be filed two weeks after the opening brief, and the reply to be filed one

3  week after the opposition.  There will be no hearing.

4

5  **IT IS SO ORDERED.**

6  Dated:  June 15, 2005

7  _____
                                                   /s/
                                          PHYLLIS J. HAMILTON
                                          United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California